UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:16-CV-00135-BR

| | | |
|---|---|---|
| GOLD MINE JEWELRY SHOPPES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | ORDER |
| | ) | |
| LISE AAGAARD COPENHAGEN, A/S, | ) | |
| and TROLLBEADS UNITED STATES, | ) | |
| INC., | ) | |
| Defendants. | ) | |

This matter is before the court on the motion to dismiss and compel arbitration filed by defendants Lise Aagaard Copenhagen, A/S ("Trollbeads") and Trollbeads United States, Inc. ("TBUS") (collectively "defendants"). (DE # 17.) The motion has been fully briefed and is therefore ripe for disposition.

## I. FACTS

Plaintiff Gold Mine Jewelry Shoppes, Inc., ("Goldmine") is a North Carolina corporation that has operated a single jewelry store in Raleigh, North Carolina since 1986. (Compl., DE # 1, at 2-3.) Thomas Martin and his wife, Edlene "Eddi" Martin, are the officers and shareholders of Goldmine. (Id. at 2; see also Surreply, DE # 28, at 2.) Defendant TBUS is a subsidiary of defendant Trollbeads, a Denmark corporation. (Compl., DE # 1, at 2.) TBUS is the exclusive North American distributor of the Trollbeads line of fine jewelry and interchangeable charm bracelet beads and accessories, as well as certain other products sold under the Trollbeads brand. (See Ex. 1, DE # 18-1, at 2.) TBUS sells the Trollbeads line through multiple brick and mortar locations, an e-commerce platform, and contractually-authorized dealers. (Compl., DE # 1, at 11.)

On 21 February 2011, Goldmine and TBUS entered into a written agreement entitled the "Retailer Agreement." (See Ex. 1, DE # 18-1.) Per the terms of the Retailer Agreement, Goldmine was authorized to market and sell the Trollbeads line of fine jewelry under the trademarks, logos, designs, and copyrights applied by TBUS. (See id. at 2-3.) Goldmine alleges that it was also required to make payments to TBUS for certain fees, to purchase a point-of-sale system and countertop displays, and to prominently display the Trollbeads' logos at both its brick and mortar location and on its website. (Compl., DE # 1, at 4-5.) The Retailer Agreement contains a choice of law provision requiring that it be construed in accordance with New Jersey law. (See Ex. 1, DE # 18-1, ¶ 18.1) The Retailer Agreement also contains an arbitration provision that states:

> Each of the parties hereto herby irrevocably and unconditionally agrees that any dispute arising out of, or in connection with, the Agreement or regarding deliveries made under the Agreement must be settled with final and binding effect in accordance with the Rules of the American Arbitration Association and that any such arbitration shall take place in Princeton, New Jersey.

(Id. ¶ 18.2.)[1]

On 5 August 2014, TBUS informed Goldmine that it intended to terminate the Retailer Agreement. (Compl., DE # 1, at 11.) On 29 March 2016, Goldmine initiated this suit, alleging claims under the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, the Clayton Act, 15 U.S.C. § 12, *et seq.*, and North Carolina state law. (Id.) Thereafter, defendants filed a motion to dismiss and compel arbitration pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure and Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.* (DE # 17.) In the motion,

---

[1] The parties agree that even though Trollbeads, TBUS's parent company, is not a signatory to the Retailer Agreement, Goldmine's claims against Trollbeads are also subject, if at all, to the arbitration provision in paragraph 18.2 of the Retailer Agreement. See J.J. Ryan & Sons v. Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988) (holding that a parent company may arbitrate a claim if its subsidiary is a party to an arbitration agreement and the charges against the parent and subsidiary involve inherently inseparable facts).

defendants also request costs and disbursements incurred in connection with the instant motion. (Id.)

## II. ANALYSIS

**1. Standard of Review**

It is well settled that arbitration clauses are a subset of forum-selection clauses, the enforcement of which is considered in the Fourth Circuit as a Rule 12(b)(3) motion to dismiss for improper venue. See Aggarao v. MOL Ship Mgmt. Co., Ltd., 675 F.3d 355, 365 n.9 (4th Cir. 2012) ("[T]he Supreme Court has characterized an arbitration clause as 'a specialized kind of forum selection clause.'" (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 (1974)). "On a motion to dismiss under Rule 12(b)(3), the court is permitted to consider evidence outside the pleadings." Id. at 365-66. A plaintiff must only make a prima facie showing of proper venue in order to survive a motion to dismiss. Id. at 366. In assessing whether there has been a prima facie venue showing, the court draws all reasonable inferences in the light most favorable to the non-moving party. Id.

**2. Motion to Dismiss and Compel Arbitration**

Defendants move to dismiss the complaint and compel arbitration, arguing that the arbitration provision contained in paragraph 18.2 of the Retailer Agreement is fully enforceable and must be enforced on its terms pursuant to the FAA. (Defs.' Mem. in Support, DE # 18, at 3.) They contend that each of the claims that Goldmine alleges in the complaint fall squarely within the arbitration agreement because they "aris[e] out of, or in connection with" the Retailer Agreement and, therefore, Goldmine must submit them to arbitration before the American Arbitration Association in Princeton, New Jersey. (Id. at 5.)

3

The FAA governs the rights and responsibilities of the parties with respect to an arbitration agreement. Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc., 380 F.3d 200, 204 (4th Cir. 2004). Under the FAA, a written agreement to arbitrate shall be "'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of a contract.'" Arthur Anderson LLP v. Carlisle, 556 U.S. 624, 629-30 (2009) (quoting 9 U.S.C. § 2). The FAA reflects a "liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). "A district court therefore has no choice but to grant a motion to compel arbitration where a valid arbitration agreement exists and the issues in a case fall within its purview." Adkins v. Labor Ready, Inc., 303 F.3d 496, 500 (4th Cir. 2002) (citation omitted).

Although federal policy presumptively favors the enforcement of arbitration agreements, it is well-settled that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960); see also Johnson v. Circuit City Stores, Inc., 148 F.3d 373, 377 (4th Cir. 1998). Whether the parties have agreed to arbitrate a particular dispute is a matter of contract law in which "the court should apply 'ordinary state-law principles that govern the formation of contracts.'" Johnson, 148 F.3d at 377 (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995)). In this case, where the Retailer Agreement contains a choice of law provision, the parties agree that New Jersey state law should determine whether the arbitration provision is valid and enforceable.

Goldmine first argues that the waiver-of-rights language in the arbitration provision does not comply the requirements set forth by the Supreme Court of New Jersey in Atalese v. United

4

States Legal Services Group, L.P., 99 A.3d 306 (N.J. 2014), thus rendering the arbitration provision void and unenforceable. (Pl.'s Mem. in Opposition, DE # 23, at 3.) Goldmine relies on Atalese for the proposition that an arbitration provision must explicitly state that the contracting parties waive their rights to a jury trial or court action. (Id. at 8-10.) Defendants contend that the arbitration provision did not require a specific waiver of the parties' rights to court access because the New Jersey state courts have limited the holding in Atalese to the context of consumer cases. (Defs.' Reply, DE # 24, at 1.) More specifically, defendants argue that Atalese does not control the result in this case because the arbitration provision is not part of a consumer contract, but, instead, is contained in a "contract negotiated at arm's length and entered into by two sophisticated commercial entities." (Id. at 2.)

In Atalese, the Supreme Court of New Jersey clarified the requirements for a valid arbitration provision, holding that "[a]n agreement to arbitrate, like any other contract, must be the product of mutual assent, as determined under customary principles of contract law." 99 A.3d at 312-13 (citation and internal quotation marks omitted). The court specifically instructed that, where a contract involves a consumer transaction, "mutual assent" requires that an arbitration provision contain "waiver-of-rights language" that conveys to the contracting parties that they are relinquishing their right to bring their "claims in court or have a jury resolve the dispute." Id. at 315-16. As defendants correctly point out, subsequent to Atalese, the New Jersey state courts have limited the holding in Atalese to employment and consumer contexts. See Myska v. New Jersey Mfrs. Ins. Co., 114 A.3d 761, 778 (N.J. Super Ct. App. Div. 2015) ("The Court in Atalese has clarified the scope of this requirement in the context of arbitration clauses contained in consumer contracts."); Gastelu v. Martin, No. L-4067-14, 2014 WL 10044913, at * 6 & n.4 (N.J. Super. Ct. App. Div. July 9, 2015) (refraining from applying

5

Atalese's analysis to a commercial business transaction). In Gastelu, the Appellate Division of the Superior Court of New Jersey stressed the distinction between consumer and commercial contracts, noting that "the [waiver of rights] standard is not as stringent" for parties to a commercial contract as the one put forward in Atalese." 2014 WL 10044913, at * n.4.

The parties here dispute whether the Retailer Agreement signifies a consumer transaction and, thus, whether the arbitration provision is or is not subject to the stringent standard in Atalese. Goldmine contends that defendants' "attempt to categorize the Retailer Agreement as anything other than a consumer contract is contrary to New Jersey law." (Surreply, DE # 28, at 5.) Goldmine acknowledges that the Retailer Agreement describes the agreement as establishing a "distributor/retailer relationship" between the parties. (Compl., DE # 1, at 4.) However, in Goldmine's view, the terms and conditions of the Retailer Agreement actually indicate a "franchisor/franchisee relationship." [2] (Id.; see also Pl.'s Mem. in Opposition, DE # 23, at 2.) Goldmine therefore reasons that the parties were involved in a consumer transaction because the purchase of a franchise is covered by the New Jersey Consumer Fraud Act ("CFA"). (Surreply, DE # 28, at 5.)

The scope of the CFA "is limited to consumer transactions which are defined both by the status of the parties and the nature of the transaction itself." Hoffman v. Encore Capital Group, Inc., No. L-1798-07, 2008 WL 5245306, at * 3 (N.J. Sup. Ct. App. Div. Dec 18, 2008) (citations and quotations omitted). Goldmine cites to Morgan v. Air Brook Limousine, 510 A.2d 1197, 1205 (N.J. Super Ct. Law Div. 1986), a case in which the Superior Court of New Jersey concluded that a franchise or business opportunity is covered by the CFA when it "is offered for sale to the general public as any other merchandise is" and "[n]o special qualifications or

---

[2] Under New Jersey law, a franchise is defined as a written agreement "in which a person grants to another a license to use a trade name, trade mark, service mark or related characteristics, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise." N.J.S.A. § 56:10-3a.

6

experience are required except having sufficient funds for the down payment." The Third Circuit Court of Appeals and the New Jersey lower courts have disagreed over whether the Supreme Court of New Jersey would adopt the reasoning in Morgan. In J & R Ice Cream Corp. v. California Smoothie Licensing Corp., 31 F.3d 1259, 1274 (3d Cir. 1994), the Third Circuit concluded that the CFA does not apply to distribution or franchise transactions, even where they are available to the public at large, because those transactions involve the purchase of a business. In Kavky v. Herbalife International of America., 820 A.2d 677, 680 (N.J. Super Ct. App. Div. 2003), the Appellate Division of the Superior Court of New Jersey noted its disagreement with J & R Ice Cream, and held that small franchises and distributorships may be considered consumers under the CFA when they are not covered by the New Jersey Franchise Practices Act ("FPA") and are offered to the general public. In so holding, the Kavky court noted that it did not necessarily disagree with the result reached in J & R Ice Cream because the franchisee's agreement to operate a California Smoothie franchise in a Florida mall "appear[ed] to have involved a substantial and complex commercial transaction, which likely fell within the Franchise Practices Act." Id. at 684.

Goldmine relies on Kavky to support its argument that, as a franchisee, it is protected as a consumer by the CFA. However, application of the principles set forth in Kavky does not support a finding that the parties entered into a franchise agreement that is suggestive of a consumer transaction. In Kavky, the Appellate Division emphasized "[t]he importance of interpreting the [CFA] to cover franchises that are not sufficiently substantial to come with the Franchise Practices Act . . ." Id. at 684. The court specifically took into account whether the franchises at issue were "too small" to meet the requirements of N.J.S.A § 56:10-4(2), which sets forth that gross sale of products or services between the parties must exceed $35,000 for the 12-

7

month period immediately preceding the filing of the suit as a condition for application of the FPA. Id. at 683 (adopting and following the court's analysis in Morgan). Goldmine did not include any allegations regarding the gross sales of Trollbeads products in its complaint. However, Goldmine did allege that its actual sales of Trollbeads products were approximately $597,000 in 2013, and that it was on pace for actual sales of approximately $369,500 in 2014 before the franchise was terminated. (Compl., DE # 1, at 3.) In this respect, the present case involves a substantial transaction that stands in contrast to the franchise relationships in Morgan and Kavky that have been recognized as consumer transactions by the New Jersey lower courts. But cf. Pukar Int'l. Inc. v. Hallmark Retail, Inc., No. L-2087-10, 2011 WL 2713457, at * 6 (N.J. Super. Ct. App. Div. July 14, 2011) (rejecting franchisee's "assertion that absent a specific waiver of its right to court access, the [arbitration] provision is unenforceable" because "[franchisee] dealt with [franchisor] at arm's length, its shareholders are business people and this is a commercial business arrangement, not a consumer transaction"). Therefore, whether or not the CFA applies to franchises in general, this particular franchise relationship is not a consumer transaction covered by the CFA. Accordingly, the court finds that the Retailer Agreement's arbitration provision is not subject the disclosure requirements for waiver of a jury trial outlined in Atalese.

Next, Goldmine contends that the arbitration provision is unenforceable because it is part of a standardized contract that was not mutually negotiated by the parties. (Surreply, DE # 28, at 1-4.) In support of this argument, Goldmine relies on the Supreme Court of New Jersey's decision in Kubis & Perszyk Associates, Inc. v. Sun Microsystems, Inc., 680 A.2d 618, 627 (N.J. 1996), which held that a forum-selection clause in a franchise agreement that designated an out-of-state judicial forum was presumptively invalid due to the "superior bargaining position" of a

8

Case 5:16-cv-00135-BR   Document 34   Filed 03/07/17   Page 8 of 12

franchisor.  (Id. at 3.)  It is true that "state law may affect the validity and enforceability of [an] arbitration [agreement] to the extent that state law applies to 'the revocation of any contract.'" Doctor's Assocs., Inc. v. Hamilton, 150 F.3d 157, 163 (2d Cir. 1998) (quoting 9 U.S.C. § 2). However, the Supreme Court has found "nothing in the [FAA] indicating that the broad principle of enforceability [of arbitration agreements] is subject to any additional limitations under state law."  Southland Corp. v. Keating, 465 U.S. 1, 11 (1984).  Thus, "in so far as Kubis can be said to invalidate forum selection clauses in franchise agreements, . . . the FAA preempts such invalidation."  Cohen v. Stratis Bus. Ctrs., Inc., No. 05-CV-1223(JLL), 2005 WL 3008807, at * 3 (D.N.J. Nov. 9, 2005) (citations omitted); see also Hamilton, 150 F.3d at 162 ("Kubis did not establish a 'generally applicable' contract defense that applies to 'any' contract; it invalidated a franchise agreement's forum selection clause under the New Jersey Franchise Practices Act because it required the franchisee to sue in another jurisdiction.").

Although the arbitration provision at issue here is not presumptively invalid under Kubis, Goldmine can still challenge the validity of the provision under basic contract principles.  See Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687 (1996) (noting "[g]enerally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]").  Goldmine's argument concerning the standardized contract and the lack of mutual negotiation by the parties is one directed at the Retailer Agreement's adhesive nature.  "A contract of adhesion . . . is a contract 'presented on a take-it-or-leave it basis, commonly in a standardized printed form without opportunity of the 'adhering' party to negotiate except perhaps on a few particulars.'"  Martindale v. Sandvik, Inc., 800 A.2d 872, 880 (N.J. 2002) (citation omitted).  According to Goldmine, the Retailer Agreement was drafted entirely by defendants with designated blanks for completion by each

9

"retailer." (Surreply, DE # 28, at 2.) Goldmine further claims that it was required to sign the Retailer Agreement in order to become a "retailer" of Trollbeads products, and that the agreement was never counter-executed by defendants. (Id.) Given these circumstances, the court assumes, without deciding, that the Retailer Agreement is an adhesion contract.

Under New Jersey law, "[t]he observation that a contract falls within the definition of a contract of adhesion is not dispositive of the issue of enforceability." Martindale, 800 A.2d at 880 (citation omitted). In determining whether an adhesion contract is enforceable, courts consider not only to the standardized nature of the contract, but also "the subject matter of the contract, the parties' relative bargaining positions, the degree of economic compulsion motivating the 'adhering' party, and the public interests affected by the contract." Id. The Supreme Court of New Jersey has generally focused on the fourth factor, the public interest, in determining whether the terms of an adhesion contract should be enforced. See Delta Funding Corp. v. Harris, 912 A.2d 104, 111 (N.J. 2006) (holding that even though the first three factors "suggest a high level of procedural unconscionability," these factors, did not, by themselves, render the contract unenforceable). Therefore, "the observation that the [executed agreement] fit[s] the definition of [a] contract[] of adhesion is the beginning, not the end, of the inquiry" and the court "must determine as a matter of policy whether to enforce the unilaterally-fixed terms of the [agreement]." Rudbart v. N. Jersey Dist. Water Supply Comm'n, 605 A.2d 681, 686 (N.J. 1992); see also Gras v. Assocs. First Capital Corp., 786 A.2d 886, 889 (N.J. Sup. Ct. App. Div. 2001) ("Significantly, the mere fact that a contract is adhesive does not render it unenforceable; that issue must be determined as a matter of policy".).

Here, defendants are a multi-national organization with franchises located throughout the United States. Goldmine is a merchant with numerous years of experience operating a jewelry

store.  Although Goldmine is an experienced business entity, defendants are undisputedly larger and more sophisticated entities.  Despite the disparate bargaining power between the parties, Goldmine does not allege that there was a high degree of economic compulsion here or that it was obligated to enter into a contract with defendants.  Furthermore, Goldmine does not contend that it would be against the public interest for the court to enforce the Retailer Agreement.  Therefore, after considering the factors articulated in Martindale, the court finds that the Retailer Agreement is not unconscionable under New Jersey law.

In sum, the Retailer Agreement's arbitration provision is neither unconscionable nor invalid under New Jersey law.  Because a valid agreement to arbitrate exists, the enforceability of the arbitration provision depends on whether Goldmine's claims fall within the scope of the provision.  As noted above, the arbitration provision requires arbitration of "any dispute arising out of, or in connection with, the Agreement or regarding deliveries made under the Agreement . . ."  (See Ex. 1, DE # 18-1, ¶ 18.2)  In its complaint, Goldmine asserts that all of its claims arise out of the franchise/franchisee relationship between the parties, which was established by the Retailer Agreement.  (Compl., DE # 1, ¶¶ 70, 75, 87, 89, 97, 105.)  Therefore, the claims asserted in Goldmine's complaint fall within the scope of the arbitration provision and are not for the court to decide.  Accordingly, the court will submit the case to binding arbitration.

Defendants have requested costs and disbursements incurred as a result of Goldmine's resistance to arbitration.  Although the court has found in defendants' favor, it cannot be said that Goldmine's motion was either without justification or patently frivolous.  See Chauffeurs, Teamsters & Helpers, Local Union No. 765 v. Stroehmann Bros. Co., 625 F.2d 1092, 1094 (3d Cir. 1980) (noting that under the FAA, costs and fees are generally awarded if the defaulting party acted without justification).  Accordingly, defendants' request for costs will be denied.

## III.  CONCLUSION

For the reasons stated herein, defendants' motion to dismiss and compel arbitration, (DE # 17), is GRANTED.  Defendants' request for costs and disbursements incurred in connection with the instant motion is DENIED.  Goldmine is ordered to arbitrate its claims against defendants in accordance with the written agreement between the parties.  The Clerk is DIRECTED to enter judgment in favor of defendants and close this case.

This 6 March 2017.

```
                              W. Earl Britt
                              Senior U.S. District Judge
```